# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

───────────

No. 11-3002

───────────

| | | |
|---|---|---|
| United Steel Workers of America Local 2660, | * * * | |
| Appellant, | * * | Appeal from the United States District Court for the |
| v. | * * | District of Minnesota. |
| United States Steel Corporation, | * * * | |
| Appellee. | * | |

───────────

Submitted:  May 16, 2012
Filed: July 2, 2012

───────────

Before WOLLMAN, BEAM, and LOKEN, Circuit Judges.

───────────

WOLLMAN, Circuit Judge.

United Steel Workers of America Local 2660 (the Union) appeals the district court's[1] order granting United States Steel Corporation's (U.S. Steel) motion for summary judgment and denying the Union's motion for summary judgment on its claim for damages under the Worker Adjustment and Retraining Notification Act (the WARN Act), 29 U.S.C. §§ 2101-09.  The Union contends that U.S. Steel failed to provide required notice under the WARN Act prior to a mass layoff at a U.S. Steel

───────────

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

iron ore plant. Agreeing with the district court that an exception to the WARN Act for unforeseeable business circumstances applies, we affirm.

I.

U.S. Steel operates an iron ore plant in Keewatin, Minnesota (the "Keetac plant"). The Keetac plant produces iron pellets, 97 percent of which are used in the steelmaking process at two of U.S. Steel's thirteen steelmaking facilities – Granite City Works, in Illinois, and Great Lakes Works, in Michigan. Granite City Works and Great Lakes Works primarily produce steel for the construction and automotive industries.

During the first three quarters of 2008, U.S. Steel reported some of the highest sales and net income in its history, and it was operating near full capacity when the economic downturn began in late 2008. In its initial response to the downturn, U.S. Steel planned to temporarily idle blast furnaces at its steelmaking facilities, along with other gradual methods to reduce costs. As the economic crisis deepened in November 2008, however, U.S. Steel announced a complete idling of Granite City Works and Great Lakes Works. As a result, U.S. Steel idled operations at the Keetac plant and laid off 313 workers represented by the Union.

U.S. Steel developed the plan to implement the idling and layoffs on November 28 and 29, 2008. The Executive Management Committee approved the plan on December 1, 2008, the Board of Directors and the Union were informed of the decision on December 2, 2008, and a WARN Act notice was sent to the Union on December 3, 2008, stating the following:

> The purpose of this letter is to notify you regarding the layoff of certain
> employees affected by the Company's intention to temporarily idle the
> operations at Keetac due to the recent major and unanticipated downturn
> in the United States and global economy, and the resultant sharply lower

demand for the plant's products. . . . The information in this notice is based upon the best information available to the Company as of this date and is being provided as promptly as practicable in light of the extraordinary and rapidly declining business circumstances.

App'x 0104-05. The layoff occurred between December 7 and 21, 2008. By December 29, 2009, nearly all the laid-off workers had been recalled.

The Union filed a complaint for damages on August 25, 2009, alleging that U.S. Steel had violated the WARN Act by failing to provide sixty days' notice of the mass layoff to the Union or affected employees, as required under the statute. U.S. Steel moved for summary judgment, arguing that an exception to the WARN Act for unforeseeable business circumstances applied. In support, U.S. Steel submitted affidavits by John Price, who served as U.S. Steel's Vice President of Supply Chain Management in 2008, and John Skube, Manager of Employee Relations for U.S. Steel's Minnesota Ore Operations. Price attested that, during his forty years at U.S. Steel, he had "never witnessed such a massive and precipitous drop in customer orders as occurred during the latter part of 2008," that U.S. Steel's "traditional methodology of relying on quarterly marketing and sales forecasts to load and schedule our facilities proved inadequate during this period," and that "[b]ased on the accelerating deterioration in business conditions at the end of November, it was evident that further reductions in operations . . . had to be accomplished immediately - i.e., in early December . . . in the face of what was recognized - at that point - as an unprecedented economic crisis." Price Decl. ¶¶ 33-34. From July to early November of 2008, U.S. Steel's blast furnace capacity utilization rate dropped from 92 percent to 52 percent, then to 46 percent by late November 2008.[2] To operate profitably, a 65 percent capacity utilization rate is necessary. The Union did not dispute the evidence presented by U.S. Steel, but argued that U.S. Steel did not present sufficient

_____

[2]It is noteworthy that U.S. Steel's ten-year strategic plan developed in July 2008 predicted utilization rates above 90 percent through 2017.

-3-

evidence to sustain its burden of proof on the unforeseeable business circumstances exception.

In granting summary judgment to U.S. Steel, the district court concluded that the exception for unforeseeable business circumstances applied; thus, sixty days' notice was not required under the circumstances.

## II.

"We review the district court's grant of summary judgment de novo, applying the same standards as the district court and viewing the evidence in the light most favorable to the nonmoving party." Zike v. Advance Am., Cash Advance Ctrs. of Mo., Inc., 646 F.3d 504, 509 (8th Cir. 2011) (quoting Travelers Prop. Cas. Co. of Am. v. Gen. Cas. Ins. Co., 465 F.3d 900, 903 (8th Cir. 2006)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

Under the WARN Act, certain large employers who order a plant closing or mass layoff must provide sixty days' written notice to affected employees or their union representatives, among others. 29 U.S.C. § 2102(a)(1). Various exceptions to this requirement exist, operating as affirmative defenses. 29 U.S.C. § 2102(b); see Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1060 (8th Cir. 1996). The exception at issue in this case is the "unforeseeable business circumstances" exception, which permits an employer to order a mass layoff before conclusion of the sixty-day notice period if the layoff is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden,

dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). Examples of such circumstances that "might each be considered" an unforeseeable business circumstance include "[a] government ordered closing of an employment site that occurs without prior notice," "[a] principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn." Id.

The "employer bears the burden of proof that conditions for the exceptions have been met." 20 C.F.R. § 639.9; see Loehrer, 98 F.3d at 1060 (noting that "the employer bears the burden of proving the existence of conditions giving rise to the exception") (citations omitted). Although absolved from the sixty-day notice requirement, an employer satisfying its burden of persuasion on an applicable exception still "shall give as much notice [of the layoff] as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3); see Burnsides v. MJ Optical, Inc., 128 F.3d 700, 704 (8th Cir. 1997) (noting that the "unforeseeable business circumstances defense still requires employer to give as much notice of closing as practicable once causal event becomes known") (citation omitted).

A. Whether the Unforeseeable Business Circumstances Exception Applies

The parties agree that the layoff in question is subject to the provisions of the WARN Act. The parties dispute, however, the applicability of the unforeseeable business circumstances exception. The Union argues that U.S. Steel failed to present sufficient evidence to sustain its burden of persuasion that the effects of the 2008 economic downturn on the steelmaking industry were an unforeseeable business circumstance as of October 8, 2008, sixty days before the layoff began. The Union contends that U.S. Steel failed to identify an event that occurred after October 8, 2008, that constituted an unforeseeable business circumstance, given that the general

-5-

economic downturn was well-known by that date.  The Union also argues that U.S. Steel did not present any evidence of how similarly situated employers responded to the economic conditions.  The Union thus requests that the case be remanded for trial to determine whether U.S. Steel encountered an unforeseeable business circumstance and, if so, when such circumstance occurred and whether U.S. Steel provided notice as soon as practicable after such circumstance occurred.

The test for determining whether business circumstances are not reasonably foreseeable "focuses on an employer's business judgment," and an employer "must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market."  20 C.F.R. § 639.9(b)(2); Loehrer, 98 F.3d at 1061 (noting that "a company will be excused from WARN liability if, when confronted with potentially devastating occurrences, it reacts as would reasonable employers within its own market") (citation omitted).  "The Department of Labor has indicated that the exception should not be narrowly construed, that we apply an objective test to analyze the 'commercial reasonableness of the employer's actions,' and that '[e]ach claim of unforeseeable business circumstances must be examined on its own merits . . . in terms of whether the employer reasonably . . . could not foresee that the event would occur . . . .'"  Gross v. Hale-Halsell Co., 554 F.3d 870, 875-76 (10th Cir. 2009) (quoting 54 Fed. Reg. 16,042, 16,061-63 (Apr. 20, 1989) (codified at 20 C.F.R. pt. 639)).  The employer is not required "to accurately predict general economic conditions that also may affect demand for its products or services."  20 C.F.R. § 639.9(b)(2).

The economic crisis of late 2008, when coupled with the dramatic decline in customer orders at U.S. Steel, constituted an unforeseeable business circumstance under the WARN Act.  The dispute here centers on when that circumstance occurred.  The Union correctly notes that the general economic crisis commenced prior to October 8, 2008, the sixtieth day before the layoff.  U.S. Steel counters that the resultant sharply reduced demand for steel was not clear until late November 2008,

when it became apparent that the operational approach that had served U.S. Steel well in previous downturns was insufficient to combat "the dire circumstances faced by the entire industry world-wide." Price Decl. ¶¶ 29-30. These circumstances, in U.S. Steel's business judgment, "presented factors that had to be dealt with immediately to simply protect survival."[3] Price Decl. ¶¶ 29-30.

The operative inquiry is when it became foreseeable that the downturn would affect U.S. Steel to such a dire extent. "[I]t is the probability of occurrence [not the mere possibility] that makes a business circumstance 'reasonably foreseeable.'" Halkias v. Gen. Dynamics Corp., 137 F.3d 333, 336 (5th Cir. 1998); Roquet v. Arthur Andersen LLP, 398 F.3d 585, 589 (7th Cir. 2005) (same). On the one hand, various evidence demonstrates that U.S. Steel was aware, significantly prior to issuing the WARN Act notice, that the economic downturn would reduce demand for its products. Notably, on October 28, 2008, U.S. Steel issued its end-of-quarter press release for the third quarter of 2008, in which its Chairman and CEO John Surma stated that:

> The volatile global economic climate is having significant negative effects on our business and our forward view is limited because of low order backlogs and short leadtimes. We expect a decline in fourth quarter results mainly due to softening demand and prices for flat-rolled products in North America and Europe, and we expect to continue to operate at reduced production levels, corresponding with customer order rates.

---

[3]Historically, U.S. Steel's business planners had created the next calendar year's operating plan and steel demand forecasts during the fourth quarter of the preceding year. Because of the clouded economic outlook during the fourth quarter of 2008, however, the 2009 business planning process was repeated four times (once each in October, November, and December of 2008, and in January of 2009).

App'x 0069-70.  The concerns expressed in the press release were validated by a November 4, 2008, *New York Times* article in the record, which reported that automobile sales in the United States plummeted in October of 2008 "to levels not seen in the auto industry in 25 years."  Bill Vlasic & Nick Bunkley, "Automakers Report Grim October Sales," *N.Y. Times*, Nov. 4, 2008.

Knowledge of an economic downturn alone, however, does not bar application of the unforeseeable business circumstances exception.  See Loehrer, 98 F.3d at 1062; Gross, 554 F.3d at 876-77.  "Rather, an objective focus is required–whether a 'similarly situated employer in the exercise of commercially reasonable business judgment would have foreseen'" the plunging demand for steel.  Gross, 554 F.3d at 877 (quoting Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs., 173 F.3d 175, 186 (3d Cir. 1999)).  In this inquiry, "we consider the facts and circumstances that led to the [layoffs] in light of the history of the business and of the industry in which that business operated."  Id. (quoting Elsinore Shore, 173 F.3d at 186) (alteration in original).

Nothing in the record suggests that the extent of the economic downturn and its effects on the steel industry were probable anytime before late November 2008, much less sixty days before the layoff began.  To the contrary, Price attested that the decline in demand, which U.S. Steel's traditional methodology had not forecasted, resulted in late November in capacity utilization rates that were unprecedented in both the steel industry generally as well as in the history of the century-old company.  For U.S. Steel, this crisis culminated in the accelerating deterioration of its business conditions at the end of November, at that point making evident the necessity of an immediate reduction in force.

The undisputed evidence in the record demonstrates that the abbreviated WARN Act notice given by U.S. Steel was caused by an unanticipated and dramatic major economic downturn, the depth of which was not fully apparent until late

November 2008. By then, demand for U.S. Steel's products—which had been at historically high levels through the first three quarters of 2008—was in a "free fall." Price Decl. ¶ 30. Prior to planning the layoff on November 28 and 29, 2008, U.S. Steel had been implementing less drastic measures—based on past history during downturns—in response to the events during the fall of 2008. In other words, it was fighting to keep the Keetac plant afloat, and "the WARN Act is not intended to deter companies from fighting to stay afloat." Roquet, 398 F.3d at 589 (citing Watson v. Mich. Indus. Holdings, Inc., 311 F.3d 760, 765 (6th Cir. 2002)). Given the juxtaposition between the unprecedented high demand for steel throughout most of 2008 and the unforeseeably precipitous drop in demand during the final quarter of 2008, U.S. Steel acted within the scope of commercially reasonable business judgment when initially attempting to weather the storm before ultimately concluding—upon realizing that its business was in a free fall—that an immediate idling of the Keetac plant was necessary.[4]

Although the economic downturn was apparent well before December 3, 2008, the resultant sharply decreased demand for steel was not. U.S. Steel presented undisputed evidence that it "reasonably expected to weather the downturn in the

---

[4]The Union erroneously contends that the unforeseeable business circumstances exception cannot apply because no momentous event occurred after October 8, 2008, constituting the unforeseeable business circumstance. WARN Act defendants, however, "need not show that the circumstances which caused a plant closing or mass layoff arose from out of the blue to qualify for the exception." Roquet, 398 F.3d at 590 (citing Jurcev v. Cent. Cmty. Hosp., 7 F.3d 618, 626 (7th Cir. 1993) (hospital entitled to the exception despite awareness of precarious financial condition and potential loss of funding that ultimately led to its closing); Elsinore Shore, 173 F.3d at 186 (casino owner entitled to exception where it could not be sure if or when gaming commission would revoke its license); Loehrer, 98 F.3d at 1062 (defense contractor exempt from WARN Act despite being aware that government might cancel fighter plane contract)).

market as it had done many times in the past," until the end of November of 2008. Price Decl. ¶ 47. A company, "faced with [an] unprecedented cataclysmic event, reasonably [may] need[] a little time to assess how things would shake out. And it [i]s not unreasonable for the company to think it could survive the carnage until . . . . it ran up the white flag of surrender and gave the bad news to its employees." Roquet, 398 F.3d at 590. The WARN Act does not impose upon an employer a requirement to provide sixty days' notice or continue in business to its detriment for the sixty-day notice period simply because it is economically feasible or possible to do so. See Loehrer, 98 F.3d at 1061-62 n.7 (citations omitted). This case certainly is not analogous to the prototypical WARN Act violation of "a company that secretly plotted for a long time to move its operation to Mexico and closed up shop without any notice to its employees." Roquet, 398 F.3d at 591. Rather, U.S. Steel thought it could survive the economic downturn until the unprecedented effects on the steel industry manifested themselves in late November 2008, thus requiring immediate action in its commercially reasonable business judgment.[5] In light of these circumstances, we conclude that U.S. Steel satisfied its burden of proving that the conditions giving rise to the unforeseeable business circumstances exception have been met.

---

[5]The Union argues that U.S. Steel failed to present direct evidence of how similarly situated employers predicted demand in the particular market, as contemplated by 20 C.F.R. § 639.9(b)(2) for determination of whether the employer exercised commercially reasonable business judgment. Although U.S. Steel did not present direct evidence of how any specific similarly situated employer predicted demand in the steel market, it did consult the market forecasts of "various steel industry analysts, including the International Iron and Steel Institute, World Steel Dynamics, and the publishers of the *Steel Business Briefing*," together with that of Goldman Sachs. Price Decl. ¶ 18.

## B. Sufficiency of the Notice

The Union claims that U.S. Steel did not provide notice as soon as practicable in this case. We have deemed notice sufficient when—after the causal event giving rise to the layoff becomes known—the employer takes approximately one week to discuss the unforeseen circumstances with business advisors and determine how to respond before giving notice. Loehrer, 98 F.3d at 1057 (eight days); see also Gross, 554 F.3d at 878 (seven days). Here, the causal event became known no earlier than November 28, 2008, when U.S. Steel began formulating its plan to idle Granite City Works, Great Lakes Works, and the Keetac plant. Once the causal event became known, U.S. Steel took a Thanksgiving holiday weekend to plan the layoffs and two business days to seek approval from the Executive Management Committee and to notify the Board of Directors and the Union. It then acted quickly in formally delivering the unfortunate news to the affected employees the next day. Thus, we conclude that U.S. Steel gave as much notice of the Keetac plant layoff as was practicable.

The Union also challenges the sufficiency of the written notice, claiming that the notice was deficient under the WARN Act's requirement that the employer "shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3). The applicable Department of Labor regulations further require that "[a]ll notice must be specific." 20 C.F.R. § 639.7(a)(1). We conclude that U.S. Steel's notice satisfied these requirements. The notice discussed the underlying factual events leading to a reduced notice period and thus provided the employees an explanation of U.S. Steel's difficulties and the rationale for the reduced notice period.

## IV.

The judgment is affirmed.

———————————————